# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-4151

_____

In re Spirit Holding Company, Inc.,

Debtor.

_____

Central Hardware Company, Inc.,

Appellee,

v.

Sherwin-Williams Company,

Appellant.

_____

Peter Lumaghi,

Trustee.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\* Appeals from the United States
\* District Court for the Eastern
\* District of Missouri.
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

No. 97-4353
_____

In re Spirit Holding Company, Inc.,   *
   *
      Debtor.   *
   *
   *
_____   *
   *
Central Hardware Company, Inc.,   *
   *
      Appellee,   *
   *
      v.   *
   *
Walker-Williams Lumber Company,   *
   *
      Appellant.   *
   *
_____   *
   *
Peter Lumaghi,   *
   *
      Trustee.   *

_____

Submitted:  June 8, 1998

Filed:  August 28, 1998

_____

Before RICHARD S. ARNOLD and MORRIS SHEPPARD ARNOLD, Circuit Judges, and PANNER,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Central Hardware Company filed a voluntary petition for bankruptcy relief, *see* 11 U.S.C. §§ 1101-1146, six days after its parent, the Spirit Holding Company, had filed its own similar petition. These appeals concern two wire transfers, one to the Sherwin-Williams Company and the other to the Walker-Williams Lumber Company, that Central made in the interval between the bankruptcy filings of Central and Spirit. The trustee in bankruptcy sought to avoid the payments as preferential transfers in violation of 11 U.S.C. § 547, and the bankruptcy court granted summary judgment in favor of Sherwin-Williams and Walker-Williams. On separate appeals, the district court reversed the bankruptcy court. The district court opinion with respect to Sherwin-Williams is unpublished; *see In re Spirit Holding Company, Inc.*, 214 B.R. 891 (E.D. Mo. 1997), with respect to Walker-Williams. Sherwin-Williams and Walker-Williams appeal the judgments of the district court,[2] and we affirm.

I.

The bankruptcy code provides that a trustee in bankruptcy may avoid certain transfers made 90 days before the petition for bankruptcy is filed, *see* 11 U.S.C. § 547(b), but allows the transferee certain defenses to the trustee's broad avoidance power, *see* 11 U.S.C. § 547(c). The question here is whether the payments at issue

_____

[1]The Honorable Owen M. Panner, United States District Judge for the District of Oregon, sitting by designation.

[2]The Honorable George F. Gunn, Jr., United States District Judge for the Eastern District of Missouri, with respect to Sherwin-Williams; the Honorable Stephen Nathaniel Limbaugh, United States District Judge for the Eastern District of Missouri, with respect to Walker-Williams.

were made in the ordinary course of business, for if they were, they are not subject to the trustee's power of avoidance. *See* 11 U.S.C. § 547(c)(2).

A transfer by a debtor must have three characteristics before it qualifies as one made in the ordinary course of business: it must be for a debt incurred in the ordinary course of business, it must be made in the ordinary course of business of financial affairs of the debtor and the transferee, and it must be made according to ordinary business terms. *See* 11 U.S.C. § 547(c)(2). The parties here do not dispute the holding that each of the transfers was for a debt incurred in the ordinary course of business, *see* 11 U.S.C. § 547(c)(2)(A). The dispute concerns whether the district court properly held that the transfers at issue do not satisfy the second and third statutory requirements. Because we hold that those transfers do not satisfy the requirement that they be made in the ordinary course of business, *see* 11 U.S.C. § 547(c)(2)(B), we need not consider whether the payments were made according to ordinary business terms, *see* 11 U.S.C. § 547(c)(2)(C).

We have indicated that " 'there is no precise legal test which can be applied' in determining whether payments by the debtor during the 90-day period were 'made in the ordinary course of business; rather, th[e] court must engage in a "peculiarly factual" analysis.' " *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991), quoting *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir. 1989), itself quoting *In re First Software Corp.*, 81 B.R. 211, 213 (Bankr. D. Mass. 1988). " '[T]he cornerstone of this element of a preference defense is that the creditor needs [to] demonstrate some consistency with other business transactions between the debtor and the creditor.' " *Lovett*, 931 F.2d at 497, quoting *In re Magic Circle Energy Corp.*, 64 B.R. 269, 272 (Bankr. W.D. Okla. 1986).

The legislative history of § 547(c)(2) also provides us with some guidance in deciding this case. The relevant congressional reports reveal that the purpose of this section was "to leave undisturbed normal financial relations, because it does not detract

from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S. Rep. No. 95-989 at 88 (1978), *reprinted in* 1978 *U.S.C.C.A.N.* 5787, 5874; H.R. Rep. No. 95-595 at 373 (1977), *reprinted in* 1978 *U.S.C.C.A.N.* 5963, 6329.

With these principles in mind, we turn to a consideration of the facts of the cases before us.

## II.

Central purchased paint products and related merchandise from Sherwin-Williams for several years prior to filing bankruptcy, and Central typically paid Sherwin-Williams by check. Central made two payments by wire transfer in 1992, however, after it exceeded its credit limit and Sherwin-Williams threatened to disrupt delivery of goods.

On March 22, 1993, Central sent a check to Sherwin-Williams in payment of outstanding invoices. The parties do not dispute that the check conformed to the ordinary financial dealings between the parties, as it was neither unusually large nor unusually early or late. The next day, Central's parent company petitioned for relief in bankruptcy court. A day later, Central called Sherwin-Williams to inquire whether it had received Central's check, and Sherwin-Williams indicated that it had not. On March 25, Central called Sherwin-Williams again, and Sherwin-Williams stated that the company still had not received the check. (Although Sherwin-Williams apparently did not know so at the time, the check had in fact arrived earlier that day.) Central then informed Sherwin-Williams that it would make the outstanding payment by wire, and later that day Central indeed wired the money to Sherwin-Williams and stopped payment on the check. Four days later, Central filed for bankruptcy relief. Sherwin-Williams argues that the transfer was made in the ordinary course of business because there was little evidence that it engaged in an unusual collection effort in the relevant instance, because the wire transfer was consistent with earlier business transactions

between Central and Sherwin-Williams, and because even if the wire transfer was inconsistent, a change in the method of payment is not a sufficient deviation from past conduct to allow the conclusion that the transfer was not made in the ordinary course of business.

There was, as Sherwin-Williams points out, little direct evidence of an unusual collection effort on Sherwin-Williams's part. The testimony, in fact, tended to show that Central called Sherwin-Williams, not that Sherwin-Williams called Central. A representative of Sherwin-Williams testified, moreover, that Central proposed on its own accord to make the wire transfer. But while we understand that proof of an unusual collection effort has a tendency to show that a transfer occurred outside the ordinary course of business, *see In re Braniff, Inc.*, 154 B.R. 773, 781-82 (Bankr. M.D. Fla. 1993), the absence of an unusual collection effort by Sherwin-Williams does not necessarily make the transfer an ordinary one. It means only that we will not find that the transfer was not ordinary on account of Sherwin-Williams's collection effort.

The relevant legislative history, as we have already noted, states that the ordinary-course-of-business exception discourages unusual action "by either the debtor or his creditors." S. Rep. No. 95-989 at 88, *reprinted in* 1978 *U.S.C.C.A.N.* at 5874; H.R. Rep. No. 95-595, *reprinted in* 1978 *U.S.C.C.A.N.* at 6329. Our cases, too, focus not narrowly on the collection effort by the creditor but broadly on the consistency between the transfer at issue and other business transactions between the debtor and the creditor. *See Lovett*, 931 F.2d at 497-99. Thus, even assuming that Central acted on its own initiative, we must determine whether that initiative comported with the ordinary course of financial transactions carried on between Central and Sherwin-Williams.

Sherwin-Williams maintains that the wire transfer at issue was indeed consistent with the ordinary course of financial transactions between it and Central. For this proposition, Sherwin-Williams relies upon the fact that Central had made two previous

payments to Sherwin-Williams by wire transfer. If Central had done it before, the argument runs, then doing it again cannot fail to be ordinary. This argument, while superficially appealing, overlooks the facts surrounding those earlier wire transfers. A representative of Central testified that each of the 1992 wire transfers was made because Central had substantially exceeded its credit limit and Sherwin-Williams was threatening to withhold goods. One may therefore conclude that a wire transfer is an ordinary financial transaction in this case insofar as it is a response by Central to a threat by Sherwin-Williams to withhold goods. But, as we noted above, and as Sherwin-Williams itself asserted, there is little evidence that Sherwin-Williams employed any unusual collection effort with respect to the 1993 payment. Given the evidence of the parties' past financial dealings, we believe it is clear that a wire transfer was not the ordinary means to respond to a normal invoice; a wire transfer would be ordinary only in a factual context that Sherwin-Williams itself denies existed in regard to the payment at issue.

Furthermore, as the district court recognized, the transfer at issue was not merely a wire transfer. The transfer was originally attempted by check and was only subsequently effected by wire. There was no evidence that Central had an ordinary practice of issuing checks to Sherwin-Williams to pay invoices and then stopping payment on those checks and sending a wire transfer in their place. Indeed, such a replacement, taking place during the week between Central's parent company's bankruptcy filing and its own, leads this court to the same conclusion that the district court reached, namely, that the wire transfer was a preference of one creditor over others.

Sherwin-Williams maintains that the change in a method of payment, standing alone, is an insufficient deviation from past practices to take a payment out of the ordinary course of business. Bankruptcy courts seem to be somewhat divided on this question. *Compare In re Valley Steel Corp.*, 182 B.R. 728, 737-38 (Bankr. W.D. Va. 1995) (holding that payment by wire transfers was not in the ordinary course of

business because the debtor had always paid by check before), *with In the Matter of Brown Transport Truckload, Inc.*, 161 B.R. 735, 740 (Bankr. N.D. Ga. 1993) (holding that the changes in the method of payment by a debtor are not enough to make the business relationship not ordinary). While this may be an interesting question, we need not decide it today. We are not presented with a change in the form of payment alone; instead, Central replaced a check it had already issued with a wire transfer. Under the circumstances of this case, we believe that the wire transfer from Central to Sherwin-Williams represented a sufficient deviation from past dealings that the wire transfer cannot qualify as a payment made in the ordinary course of business.

### III.

Walker-Williams sold lumber products to Central for several years prior to Central's bankruptcy filing, and prior to the transfer at issue here, Central normally paid Walker-Williams by check. On March 22, 1993, Central sent a check to Walker-Williams in payment of outstanding invoices. The parties do not dispute that the check conformed to the ordinary financial dealings between the parties, as it was neither unusually large nor unusually early or late. The next day, Central's parent company petitioned for relief in bankruptcy court, and the day after that, Walker-Williams contacted Central to inquire about the effect on Central of its parent's bankruptcy. Although there is no evidence that Walker-Williams requested it to do so, Central offered to replace the check with a wire transfer, and did so the next day.

Walker-Williams argues that the wire transfer was made in the ordinary course of business because there was little evidence of an unusual collection effort on Walker-Williams's part and that a change in the method of payment was not a sufficient deviation from past conduct to allow the conclusion that the transfer was not made in the ordinary course of business. Walker-Williams thus makes arguments similar to those of Sherwin-Williams on similar facts, and we reject those arguments for the reasons that we gave in rejecting Sherwin-Williams's. Under the circumstances of this case, we believe that the wire transfer from Central to Walker-Williams was a sufficient

deviation from past dealings that the payment cannot qualify for the ordinary-course-of-business exception to the general rule of preference avoidance.

## IV.

For the foregoing reasons, we affirm the judgments of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.